1  Lina Balciunas Cockrell, Bar No. 238166
   lina@majlabor.com
2  **MESSING ADAM & JASMINE LLP**
  2150 River Plaza Dr., Suite 140
3  Sacramento, California 95833
  Telephone:   916.446.5297
4  Facsimile:   916.448.5047

5  Attorneys for Plaintiff Dominique Clifton

6

7

8            **UNITED STATES DISTRICT COURT**

9      **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

10

| | |
|---|---|
| 11 DOMINIQUE CLIFTON, | Case No. 1:21-cv-00089-NODJ-EPG |
| 12      Plaintiff, | **Memorandum of Points and Authorities in Support of Motion for Summary Judgment or, in the alternative, Summary Adjudication** |
| 13    v. | |
| 14 UNITED STATES DEPARTMENT OF JUSTICE, JEFFREY A. ROSEN, as Acting | Judge:  No District Court Judge |
| 15 Attorney General of the United States, UNITED STATES BUREAU OF ALCOHOL, | Date:   February 6, 2024 Time:   1:30 p.m. |
| 16 TOBACCO, FIREARMS and EXPLOSIVES ("ATF"), REGINA LOMBARDO, as Acting | Crtrm.:  5, 7th Floor |
| 17 Director of the ATF, FEDERAL BUREAU of INVESTIGATION ("FBI"), CHRISTOPHER | Trial Date:       July 11, 2024 |
| 18 WRAY, as Director of the FBI, | |
| 19      Defendants. | |

20

21

22

23

24

25

26

27

28

## Table of Contents

TABLE OF CONTENTS..................................................................................................... 2

TABLE OF AUTHORITIES............................................................................................... 3

I. INTRODUCTION ........................................................................................................... 6

II. BACKGROUND FACTS AND PROCEDURAL HISTORY ......................................... 8

    A.   An Abusive Situation at Home Led to an Incident at School When Clifton was in the Eighth Grade ........................................................................................................................ 8

    B.   Clifton's Grandmother Agreed to Inpatient Mental Health Treatment for Clifton............... 9

    C.   Clifton Regularly Carried and Used Firearms in His Career After High School............... 10

    D.   Despite His Qualifications, Clifton Has Failed to be Hired as a Sworn Peace Officer ...... 11

    E.   Clifton Seeks Restoration of His Second Amendment Rights.......................................... 13

III. LEGAL STANDARD .................................................................................................. 14

IV. ARGUMENT ............................................................................................................... 14

    A.   Clifton's Lifetime Firearms Prohibition is Unlawful Because Clifton Does Not Meet the Criteria for 18 U.S.C. § 922(g)(4) .......................................................................................... 14

        1.   As This Court Concluded in the FRCP 12(b)(6) Order, Judicial Involvement is Necessary for the Application of Section 922(g)(4) ........................................................... 16

            (a)   California State Law Does Not Require Judicial Involvement for Involuntary Mental Health Commitments.................................................................................................. 17

            (b)   There was No Judicial Involvement Whatsoever in Clifton's 2001 Hospitalization 20

    B.   Section 922(g)(4) is Unconstitutional As Applied to Clifton Because There is No Historical, Longstanding Prohibition of Second Amendment Rights Arising from Receiving Mental Health Treatment as a Child ...................................................................................... 21

V. CONCLUSION ............................................................................................................. 29

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4

2

Case No. 1:21-cv-00089-NODJ-EPG

Memorandum of Points and Authorities in Support of Motion for Summary Judgment

<u>**Table of Authorities**</u>

**Federal Cases**

*Ake v. Oklahoma*,
  (1985) 470 U.S. 68 ................................................................................................ 28

*California v. Campbell*,
  (9th Cir.1998) 138 F.3d 772 ................................................................................ 14

*Celotex Corp. v. Catrett*,
  (1986) 477 U.S. 317 .............................................................................................. 14

*Clifton v. US Dept. of Justice*,
  (E.D. Cal. 2022) 615 F.Supp.3d 1185 ................................................................ 16

*Dickerson v. New Banner Inst., Inc.*,
  (1983) 460 U.S. 103 ................................................................................................ 6

*District of Columbia v. Heller*,
  *(2008)* 554 U.S. 570 ...................................................................................... 24, 26

*Fraser v. Bureau of Alcohol, Tobacco,*
  *Firearms & Explosives*, (E.D. Va. 2023) No. 3:22-CV-410, 2023 WL 3355339 ............... 26, 29

*Graham v. Fla.*,
  (2010) 560 U.S. 48 ................................................................................................ 28

*Kent v. United States*,
  (1966) 383 U.S. 541 .............................................................................................. 27

*Keyes v. Lynch*,
  (M.D. Penn. 2016) 195 F.Supp.3d 702 ................................................................ 23

*Mai v. United States*,
  (9th Cir. 2020) 952 F.3d 1106 .................................................... 7, 16, 20, 23, 26

*Mai v. United States*,
  (9th Cir. 2020) 974 F.3d 1082 .............................................................................. 26

*National Steel Corp. v. Golden Eagle Ins. Co.*,
  (9th Cir. 1997) 121 F.3d 496 ................................................................................ 14

*Nat'l Rifle Assoc. v. ATF*,
  (5th Cir. 2012) 700 F.3d 185 ................................................................................ 29

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  (2022) 597 U.S. ---,  142 S. Ct. 2111 ............................................ 7, 23, 24, 29

*Roper v. Simmons*,
  (2005) 543 U.S. 551 ........................................................................................ 27, 28

*Scosche Industries, Inc. v. Visor Gear Inc.*,
  (9th Cir. 1997) 121 F.3d 675 ................................................................................ 14

*Steffel v. Thompson*,
  (1974) 415 U.S. 452 .............................................................................................. 22

*Stokes v. United States Department of Justice*,
  (N.D.Cal. 2021) 551 F.Supp.3d 993 ...................................................... 6, 16, 18

*Susan B. Anthony List v. Driehaus*,
  (2014) 573 U.S. 149 .............................................................................................. 22

*Tyler v. Hillsdale County Sheriff's Department*,
  837 F.3d 678 (6th Cir. 2016) ................................................................................ 15

*United States v. Bartley*,
  9 F.4th 1128 (9th Cir. 2021) ................................................................................ 16

*United States v. Blakeney*,
(Va. 1847) 3 Gratt. 405 .................................................................................................... 26

*United States v. Chovan*,
(9th Cir. 2013) 735 F.3d 1127 ........................................................................................... 6

*United States v. Jackson*,
(D. Md. March 13, 2023) No.: ELH-22-141, 2023 WL 2499856 ............................................. 29

*United States v. McIlwain*,
(11th Cir. 2014) 772 F.3d 688 .......................................................................................... 16

*United States v. Midgett*,
(4th Cir. 1999) 198 F.3d 143 ............................................................................................ 16

*United States v. Rehlander*,
666 F.3d 45, 50 (1st Cir. 2012) ............................................................................. 15, 16, 21

*Worth v. Harrington*,
(D. Minn. March 31, 2023) --- F.Supp.3d ——, ——, No. 21-cv-1348, 2023 WL 2745673 .... 29

**State Cases**

*Am. Acad. of Pediatrics v. Lungren*,
(1997) 16 Cal.4th 307, 315 ............................................................................................... 18

*In re D.L.*,
(2023) 93 Cal.App.5th 144 ............................................................................................... 23

*Thorn v. Superior Court*,
(1970) 1 Cal.3d 666 ......................................................................................................... 19

**Federal Statutes**

18 U.S.C., § 922(g)(4) ....................................................................... 6, 8, 15, 22, 23, 24, 29

18 U.S.C., § 922(x)(2) ...................................................................................................... 23

18 U.S.C., § 925(a) ............................................................................................................ 7

18 U.S.C., § 925(a)(1) ...................................................................................................... 22

**State Statutes**

CA Pen. Code, § 29615(a)–(c) ........................................................................................... 23

CA Pen. Code, § 832.15(a) ............................................................................................... 12

CA Welf. & Inst. Code, § 5150 .......................................................................................... 21

CA Welf. & Inst. Code, § 5150(i)(1) .................................................................................. 18

CA Welf. & Inst. Code, § 5250 ........................................................................... 14, 18, 19, 21

CA Welf. & Inst. Code, § 5252 .......................................................................................... 19

CA Welf. & Inst. Code, § 5253 .......................................................................................... 19

CA Welf. & Inst. Code, § 5254 .......................................................................................... 19

CA Welf. & Inst. Code, § 5254.1 ....................................................................................... 19

CA Welf. & Inst. Code, § 5256.1 .................................................................................. 19, 21

CA Welf. & Inst. Code, § 5256.4(a) ................................................................................... 19

CA Welf. & Inst. Code, § 5256.6 ....................................................................................... 19

CA Welf. & Inst. Code, § 5256.7 .................................................................................. 20, 21

CA Welf. & Inst. Code, § 5270.15 ..................................................................................... 19

CA Welf. & Inst. Code, § 5275 .......................................................................................... 19

CA Welf. & Inst. Code, § 5375 .......................................................................................... 20

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4

4

Case No. 1:21-cv-00089-NODJ-EPG

Memorandum of Points and Authorities in Support of Motion for Summary Judgment

CA Welf. & Inst. Code, § 5585(a) ............................................................................ 17

CA Welf. & Inst. Code, § 5585.10(b) ...................................................................... 18

CA Welf. & Inst. Code, § 5585.20 ................................................................... 17, 18

CA Welf. & Inst. Code, § 5585.50 ............................................................................ 21

CA Welf. & Inst. Code, § 5585.50(b) ................................................................ 17, 21

**Other Authorities**

Benjamin Rush, Medical Inquiries and Observations on the Diseases of the Mind 24 (1789) ...... 26

Cramer, Clayton E., Colonial Firearms Regulation (April 6, 2016) at p. 4 (located at
<https://ssrn.com/abstract=2759961> or <http://dx.doi.org/10.2139/ssrn.2759961> [as of Nov.
30, 2023]) ........................................................................................................... 25

Rey, et al.,  History of Child Psychiatry (2018) *International Association for Child and Adolescent
Psychiatry and Allied Professions* at p. 10 (located at
<https://iacapap.org/_Resources/Persistent/49c28ec074bbecfc0ea48df2deea1c6fc1de0a60/J.10-
History-Child-Psychiatry-update-2018.pdf> [as of Nov. 30, 2023]) .......................................... 25

Schowalter, A History of Child and Adolescent Psychiatry in the United States (2003) *Psychiatric
Times* (located at <https://www.psychiatrictimes.com/view/history-child-and-adolescent-
psychiatry-united-states> [as of Nov. 30, 2023]) ....................................................................... 25

Zachary M. Robole, In Defense of (Mental) Hearth and Home: Challenges to S 922(g)(4) in the
Wake of New York State Rifle & Pistol Ass'n v. Bruen, 107 Minn. L. Rev. 2329, 2361 (2023)
........................................................................................................................... 26

**Rules**

Fed. Rule of Civ. Proc. 56(c) ........................................................................................ 14

Fed. Rule of Civ. Proc. 56(c)(1)(A) .............................................................................. 14

Fed. Rule of Civ. Proc. 56(c)(4) ................................................................................... 14

**Regulations**

27 C.F.R., § 478.11 ..................................................................................... 15, 18, 21

# I.

## INTRODUCTION

Plaintiff Dominique Clifton seeks restoration of his Second Amendment rights, which he purportedly lost when he was 13 years old after receiving mental health treatment.  Federal law places an indefinite prohibition against possessing a firearm when an individual has been "adjudicated as a mental defective" or "committed to a mental institution."  18 U.S.C., § 922(g)(4); *United States v. Chovan*, (9th Cir. 2013) 735 F.3d 1127, 1138 (Section 922(g) "amounts to a 'total prohibition' on firearm possession for [certain] class[es] of individuals—in fact, a 'lifetime ban'").

It is undisputed that Clifton was never adjudicated as a mental defective.  The primary issue for this case is whether his 15-day hospitalization in 2001, which he and his legal guardian believed to be voluntary but was reported by the hospital as a certification for intensive treatment pursuant to California Welfare and Institutions Code section 5250, constitutes a commitment to a mental institution under Section 922(g)(4).  But as there was no judicial involvement in Clifton's hospitalization, there was no commitment within the meaning of the word in Section 922(g)(4) and Clifton should be fully eligible to possess and carry firearms.

"In enacting Section 922(g), Congress sought 'to keep firearms out of the hands of presumptively risky people.'"  *Stokes v. United States Department of Justice*, (N.D.Cal. 2021) 551 F.Supp.3d 993, 998 quoting *Dickerson v. New Banner Inst., Inc.*, (1983) 460 U.S. 103, 112, n.6.  Congress could not possibly have been contemplating someone like Clifton as being presumptively risky.  The incident that led to his mental health treatment arose from an abusive homelife, occurred 22 years ago when Clifton was in middle school and did not involve a firearm – or any crime.  Equally if not more important, Clifton did not allow the situation to define him and thrived in high school and as an adult.  He served in the military for eight years and then became a federal peace officer.  He has spent the last four years working as a (non-sworn) Correctional Officer for the Fresno County Sheriff's Office ("FSO").  He is in a stable, long-term relationship for well over a decade and is a dedicated father.

What's more, Clifton actually wants to be a law enforcement officer, despite the challenges of the current political and social climate.  But the California Department of Justice ("CADOJ") has reported the federal lifetime firearms ban to all prospective employer agencies who have searched Clifton's eligibility in the California Law Enforcement Telecommunications System ("CLETS").  Clifton has been unable to obtain peace officer employment, including as a Deputy Sheriff with the FSO despite his positive work history in the jail.

California does not have another forum that satisfies the federal standard for Clifton in which to seek relief from the lifetime firearms ban.  Though Clifton is more than qualified and competent to be a Deputy Sheriff and although federal law provides an official use exemption for firearms issued by a government agency,[1] the FSO will not hire him into a sworn position while the lifetime firearms ban is in effect.

The Ninth Circuit has recognized that "commitments under state-law procedures that lack robust judicial involvement do not qualify as commitments for purposes of §922(g)(4)."  *Mai v. United States*, (9th Cir. 2020) 952 F.3d 1106, 1110.  No judge ever became involved in Clifton's 2001 hospitalization.  Neither Clifton nor his legal guardian were aware of the Welfare and Institutions Code section 5250 certification for intensive treatment or the resulting lifetime firearms prohibition until 2020.  There is no required judicial involvement in California's statutory scheme for involuntary mental health treatment.  Therefore, there was no "commitment" as required in Section 922(g)(4) and Clifton should not be prohibited from possessing a firearm.

In the alternative, Section 922(g)(4) is unconstitutional as applied to Clifton because there is no historical, longstanding prohibition of Second Amendment rights arising from receiving mental health treatment as a juvenile, pursuant to the United States Supreme Court's opinion in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, (2022) 597 U.S. ---,  142 S. Ct. 2111.  Section 922(g)(4) as applied to juvenile mental health commitments is not consistent with this Nation's historical tradition of firearm regulation – which is to say that there is no historical record of laws in America's infancy prohibiting the mentally ill from possessing firearms and/or permanently

---

[1] See 18 U.S.C., § 925(a).

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                     7                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

stripping the constitutional rights of young children arising from mental health treatment. Moreover, the law has historically treated children differently from adults, with the goal of growth, maturity and rehabilitation, if necessary, into productive, law-abiding adults.

It is not enough to pay lip service to social justice without action.  This case presents an easy opportunity to right a grievous wrong.  Clifton respectfully requests that the Court order that his 2001 treatment at Gateways Hospital and Mental Health Center in Los Angeles was not a commitment to a mental institution within the meaning of 18 U.S.C. § 922(g)(4) and that Section 922(g)(4) is unconstitutional as applied to him.  Clifton further requests an order that any lifetime firearms prohibition arising from his 2001 hospitalization violates his Second Amendment rights. In the alternative, Clifton respectfully requests that the Court grant summary adjudication as to either of the above claims and order that his Second Amendment rights be restored.

## II.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

Clifton grew up in Los Angeles, California and was raised by his grandmother, Kathleen Roque, following his mother's violent death when Clifton was just 18 months old.  Declaration of Dominique Clifton ("Clifton Dec."), ¶ 2; Declaration of Kathleen Roque ("Roque Dec."), ¶ 2. Clifton attended what was then called Mount Vernon Middle School in the Los Angeles Unified School District.  Clifton Dec., ¶ 3.  Clifton was actively engaged in academics and sports and did not regularly have behavioral problems.  Clifton Dec., ¶ 4; Roque Dec., ¶¶ 3, 5.

**A.     An Abusive Situation at Home Led to an Incident at School When Clifton was in the Eighth Grade**

When Clifton was nine years old, his grandmother got married.  Roque Dec., ¶ 4; Clifton Dec., ¶ 5.  Over time, Roque's husband became physically and emotionally abusive toward her and Clifton.  Clifton Dec., ¶ 5; Roque Dec., ¶ 4.

Nearing the end of Clifton's eight grade year at school, when he was 13 years old, he was upset from a recent incident where his step-grandfather had hit him.  Clifton Dec., ¶ 6.  Clifton made statements at school about how he wanted to protect his grandmother and himself from his

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                    8                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1  step-grandfather.  *Id*.  Clifton drew a picture of a man lying on the ground and a person standing

2  over him holding a knife.  *Id*.; Roque Dec., ¶ 7.

3      Clifton did not have ready access to a gun or the intention of hurting Roque's husband.

4  Clifton Dec., ¶ 7.  Clifton was very frustrated and angry about his home situation and wanted the

5  abuse to stop.  *Id*.; Roque Dec., ¶ 5.

6      Roque met with the school principal about the incident.  Roque Dec., ¶ 8.  The Los

7  Angeles County Psychiatric Emergency Team ("PET") came to the school.  Clifton Dec., ¶ 8;

8  Roque Dec., ¶ 8.  The PET Team is a mobile response unit administered by the Los Angeles

9  County Department of Mental Health that provides psychological evaluations for involuntary

10  holds pursuant to Welfare and Institutions Code sections 5150 (adults) and 5585 (minors).

11  Request for Judicial Notice ("RJN") No. 1.  With Roque's full cooperation and agreement, the

12  PET Team transported Clifton to the Gateways Hospital and Mental Health Center in Los Angeles

13  ("Gateways Hospital").[2]  Roque Dec., ¶ 10.  Clifton did not fight or protest going to the hospital.

14  Clifton Dec., ¶ 8.

15  **B.    Clifton's Grandmother Agreed to Inpatient Mental Health Treatment for Clifton**

16      Roque spoke with Clifton's doctor, who told her he thought it would be good to admit

17  Clifton to the juvenile mental health program for a couple of weeks.  Roque Dec., ¶ 10.  Roque

18  agreed to have Clifton admitted for mental health treatment at the hospital.  *Id*.

19      Roque recalls filling out intake paperwork at Gateways Hospital for Clifton to be admitted.

20  *Id*.  Roque does not recall receiving or even seeing any document stating that Clifton had a mental

21  health disorder that rendered him likely to harm himself or others, dangerous and/or unable to care

22  for himself/gravely disabled.  Roque Dec., ¶ 12.  Roque did not believe, at that time or ever, that

23

24  [2] At the time, both Roque and Clifton either were unaware that the PET Team conducted
psychological evaluations for involuntary mental health detentions nor they did not understand

25  that if the PET Team got involved, it meant that Clifton would be involuntarily hospitalized.
Roque and Clifton did not understand that if the PET Team got involved, Clifton could potentially

26  lose his firearms rights for the rest of his life.  Roque thought the PET Team provided a service
that could help a child going through hard time the way her grandson was.  Roque Dec., ¶ 8;

27  Clifton Dec., ¶ 8.

28

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                    9                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1   Clifton was a danger to himself or others, unable to care for himself or gravely disabled.  Roque

2   Dec., ¶ 9.

3       When Roque left Gateways Hospital the day Clifton was admitted, she understood and

4   agreed that Clifton would be staying there for at least two weeks.  Roque Dec., ¶ 10.  Clifton

5   remained hospitalized at Gateways Hospital from June 12, 2001 to June 27, 2001.  *Id*.  His

6   treatment involved mostly counseling and activities with other children patients.  Clifton Dec., ¶ 9.

7   Clifton recalls his grandmother visiting him at the hospital every day.  *Id*.

8       Roque never went to court regarding Clifton's 2001 hospitalization.  Roque Dec., ¶ 14.

9   Roque is not aware of there ever being a judge involved in Clifton's 2001 hospitalization.  *Id*.

10  Roque never had an attorney represent her relating to Clifton's 2001 hospitalization.  *Id*.  Clifton

11  never went to court regarding his 2001 hospitalization.  Clifton Dec., ¶ 11.  Clifton is not aware of

12  there ever being a judge involved in his 2001 hospitalization.  *Id*.  Clifton never had an attorney

13  represent him relating to his 2001 hospitalization.  *Id*.  No one, in 2001, gave Roque (or Clifton)

14  notice that Clifton's hospitalization could or would result in a lifetime prohibition against him

15  owning firearms.  Roque Dec., ¶ 14; Clifton Dec., ¶ 12.

16      Clifton was not prescribed any continuing medication, nor was he required or even

17  recommended to have any further psychological treatment following his discharge from the

18  hospital, including therapy or counseling.  Clifton Dec., ¶ 13.

19      California State Department of Justice ("CADOJ") records show that the CADOJ received

20  and processed a Welfare and Institutions Code section 5250 lifetime firearms restriction from

21  Gateways Hospital under Clifton's name and date of birth on July 2, 2001.  Declaration of Lina

22  Balciunas Cockrell ("Cockrell Dec."), ¶ 9, Exh. 1.

23      There were no cases filed in 2001 in Los Angeles Superior Court, including the Juvenile

24  Court, the courts that would have had jurisdiction over Clifton.  Cockrell Dec., ¶¶ 3, 6, Exhs. 1-2.

25  **C.    Clifton Regularly Carried and Used Firearms in His Career After High School**

26      Roque separated from her husband and, following his hospitalization in 2001, Clifton

27  returned home.  Roque Dec., ¶¶ 16-17.  He graduated from Northview Highschool, in Covina,

28  California in 2005.  Clifton Dec., ¶ 14.  Clifton enlisted in the United States Marine Corps, serving

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                    10                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1   from August 2005 to August 2013.  He served as a machine gunner in the infantry and completed

2   three combat deployments – two to Iraq and one to Afghanistan.  Clifton Dec., ¶¶ 14-15.  In all of

3   his military assignments, he was required to train in, possess and use firearms.  Clifton Dec., ¶ 14.

4           Clifton did not have any negative incidents involving a firearm (or any disciplinary

5   actions) while he was in the Marine Corps.  Clifton Dec., ¶ 15.  He received the Certificate of

6   Commendation and the Navy-Marine Achievement Medal.  *Id*.  He was honorably discharged at

7   the rank of Sergeant in 2013.  *Id*.

8           In 2015, Clifton was hired by the Federal Bureau of Prisons ("FBOP") as a Corrections

9   Officer.  Clifton Dec., ¶ 16.  As part of his duties, he was required to possess and be prepared to

10  use a firearm.  *Id*.  He was assigned to a gun tower post, which required him to carry an assault

11  rifle.  *Id*.  As a sworn federal law enforcement officer, he had credentials authorizing him to

12  possess and carry a personal firearm off duty, which he did.  *Id*.

13          Clifton had no disciplinary actions with the FBOP.  Clifton Dec., ¶ 17.  He resigned in

14  good standing in April 2019.  Clifton Dec., ¶ 17.

15  **D.      Despite His Qualifications, Clifton Has Failed to be Hired as a Sworn Peace Officer**

16          From 2016 to 2018, Clifton applied for various local peace officer positions in California.

17  Clifton Dec., ¶ 18.  He would advance through the process with seemingly favorable results,

18  including through the required background investigation, until he was fingerprinted at which time,

19  as he understood, the agency would sent his biometric data to the CADOJ to check his history in

20  CLETS.  *Id*.  Each time he would subsequently receive a letter from the respective agency

21  rejecting him as a candidate.  *Id*.  Clifton did not understand, at the time, why he kept getting

22  rejected for these peace officer positions.  Clifton Dec., ¶ 19.

23          In documents dated 2016 to 2018, the CADOJ reported that Clifton had a lifetime firearms

24  prohibition to the Los Angeles County Sheriff's Office (twice), San Bernardino Sheriff's Office

25  and City of West Covina Police Department.  Cockrell Dec., ¶ 10, Exh. 4.

26          On April 8, 2019, Clifton was hired by the Fresno County Sheriff's Office ("FSO") as a

27  Correctional Officer, a non-sworn position pursuant to California Penal Code section 831.5, to

28  work at the Fresno County Jail.  Clifton Dec., ¶ 20.  In September 2018, the CADOJ reported to

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                    11                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1   the FSO that Clifton was <u>eligible</u> to carry, possess, receive and own firearms pursuant to Penal

2   Code section 832.15(a).  Cockrell Dec., ¶ 10, Exh. 4 (p. 12 of 15).

3     In 2020, at the encouragement of his FSO supervisors, Clifton submitted his application to

4   Fresno County for a Deputy Sheriff I position, to be a sworn peace officer.  Clifton Dec., ¶ 22.

5   This time, in May 2020, the CADOJ reported to the FSO that Clifton had the lifetime firearms

6   prohibition.  Cockrell Dec., ¶ 10, Exh. 4.  The FSO told Clifton that the Sheriff would not hire him

7   to a Deputy position until he cleared up the firearms issue and advised him to look into the matter.

8   Clifton Dec., ¶ 22; Declaration of Fresno County Sheriff John Zanoni ("Zanoni Dec."), ¶ 7.

9     Clifton submitted a form to the CADOJ, formally requesting a firearms eligibility check.

10   Clifton Dec., ¶ 23.  The CADOJ responded with a report showing a lifetime firearms prohibition

11   pursuant to Welfare and Institutions Code section 5250, reported by Gateways Hospital and

12   entered into the CADOJ system on July 2, 2001.  *Id.*, Exh. C.  This was the first time Clifton

13   became aware of his 2001 hospitalization possibly resulting in a prohibition on his eligibility to

14   possess a firearm.  *Id.*

15     On June 3, 2020, Clifton filed a "Request for Hearing for Relief from Firearms

16   Prohibition" with the Fresno County Superior Court, case no. 20-CRFP685534.  Clifton Dec., ¶

17   24.  On July 31, 2020, the court ruled that it does not have jurisdiction because the firearms

18   prohibition was pursuant to federal, not state law.  *Id.*

19     In 2022, the FSO promoted Clifton to Senior Correctional Officer.  Clifton Dec., ¶ 25.  The

20   FSO will not hire Clifton as a sworn peace officer while he has the firearms prohibition.[3]  Zanoni

21   Dec., ¶ 8.

22   _____

23   [3] Included in the CADOJ's response to Clifton's subpoena duces tecum for any and all records

24   relating to Clifton's personal firearms eligibility, is a document dated September 2020 containing
the notation ****CORRECTED COPY****, in which it appears the CADOJ reported to the FSO

25   that Clifton is <u>eligible</u> to carry, possess, receive and own firearms pursuant to Penal Code section
832.15(a).  Cockrell Dec., ¶ 10, Exh. 4.  Due to the inconsistencies in the CADOJ reporting of

26   Clifton's firearms eligibility between 2016-2020 and the fact that the FSO has not, as of yet,
proceeded with his application for a Deputy Sheriff position, Clifton seeks a determination of his

27   firearms eligibility status from this Court in order to eliminate any uncertainty, now and in the
future.

28

1   Both Clifton and his grandmother had no knowledge of the federal firearms prohibition

2   until 2020 when he applied for the Deputy Sheriff position.  Clifton Dec., ¶ 22; Roque Dec., ¶ 18.

3   For each of the Marine Corps, FBOP and FSO Correctional Officer application processes,

4   Clifton had to successfully undergo a background investigation and pass a psychological

5   evaluation, which he did.  Clifton Dec., ¶ 21.

6   Clifton underwent a full psychological evaluation by Dr. John A. Foster, Ph.D. for the

7   purposes of this litigation.  Declaration of John Alan Foster, Ph.D. ("Foster Dec."), ¶ 4.  Dr. Foster

8   is a licensed psychologist and Qualified Psychological Evaluator for the California Commission

9   on Peace Officer Standards and Training ("POST").  Foster Dec., ¶ 2.  Since 1991, Dr. Foster has

10  conducted more than 18,000 post-offer employment psychological evaluations for peace officers.

11  *Id.*  Dr. Foster concluded that, based his review of the available data and clinical interviews with

12  Clifton, it was his professional opinion that Clifton will not be likely to act in a manner dangerous

13  to public safety and that granting relief from the federal firearms prohibition would not be contrary

14  to the public interest.  Foster Dec., ¶ 5.

15  **E.      Clifton Seeks Restoration of His Second Amendment Rights**

16  Clifton filed the instant lawsuit in January 2021, alleging an as-applied Second

17  Amendment violation; Fifth Amendment Equal Protection and Due Process violations and

18  Fourteenth Amendment Equal Protection and Due Process violations.  In August 2021,

19  Defendants filed a motion to dismiss Clifton's Amended Complaint pursuant to Federal Rule of

20  Civil Procedure ("FRCP"), Rule 12(b)(6).  In July 2022, this Court issued an Order Granting in

21  Part and Denying in Part Defendants' Motion to Dismiss (hereinafter the "FRCP 12(b)(6) Order").

22  The Court dismissed Clifton's equal protection, procedural due process and substantive due

23  process claims.  The Court denied Defendants' motion to dismiss Clifton's Second Amendment

24  claim.  The Court granted Clifton leave to amend his procedural due process claim brought

25  pursuant to the Fifth Amendment.

26  In an effort to keep the case moving forward and to avoid another FRCP 12(b)(6) motion,

27  Clifton declined to amend his Fifth Amendment procedural due process claim.  Clifton proceeds

28  solely on his Second Amendment claims.

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                        13                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1

**III.**

2

**LEGAL STANDARD**

3

"Under Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to

4

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

5

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

6

of law." *Celotex Corp. v. Catrett*, (1986) 477 U.S. 317, 322 (citations omitted).

7

Summary judgment may be granted, where appropriate, based on the pleadings, discovery

8

and disclosure documents on file, and any affidavits or extrinsic evidence submitted in connection

9

with the motion.  FRCP 56(c)(1)(A).  Declarations or affidavits must be made on personal

10

knowledge, set forth facts that would be admissible in evidence and show the affiant or declarant

11

is competent to testify to the matters stated.  FRCP 56(c)(4).  "[H]earsay evidence in Rule 56

12

affidavits is entitled to no weight." *Scosche Industries, Inc. v. Visor Gear Inc.*, (9th Cir. 1997) 121

13

F.3d 675, 681 (internal quotations omitted).  Conclusory allegations, without factual support, are

14

insufficient to support or defeat summary judgment.  *National Steel Corp. v. Golden Eagle Ins.*

15

*Co.*, (9th Cir. 1997) 121 F.3d 496, 502.

16

A motion for summary adjudication, sometimes referred to as a motion for partial

17

summary judgment, is governed by the same standard as a typical motion for summary judgment.

18

*California v. Campbell*, (9th Cir.1998) 138 F.3d 772, 780–81.

19

**IV.**

20

**ARGUMENT**

21

22

**A.     Clifton's Lifetime Firearms Prohibition is Unlawful Because Clifton Does Not Meet the Criteria for 18 U.S.C. § 922(g)(4)**

23

The CADOJ recorded Clifton's firearms prohibition as the result of his 2001

24

hospitalization (when he was 13 years old), wherein Gateways Hospital apparently reported

25

having certified Clifton for intensive treatment pursuant to California Welfare and Institutions

26

Code section 5250 (discussed *infra*).  See Cockrell Dec., ¶ 9, Exh. 3.  The state firearm prohibition

27

of five years under Welfare and Institutions Code section 8103(g)(1)(i) expired in 2006 – 17 years

28

ago.  Any current restriction on Clifton's ability to possess and carry firearms arises entirely from

1   federal law.  However, as a matter of law, Clifton's 2001 hospitalization does not meet the criteria

2   for the lifetime federal firearms prohibition.

3       Title 18, Section 922(g)(4) of the United States Code provides that it is unlawful for an

4   individual to possess a firearm who has been "adjudicated as a mental defective" or "committed to

5   a mental institution."  To be adjudicated as a mental defective, the federal regulations require a

6   "determination by a court, board, commission or other lawful authority that a person, as a result of

7   marked subnormal intelligence, or mental illness, incompetency, condition, or disease; [¶] (1) Is a

8   danger to himself or to others; or (2) Lacks the mental capacity to contract or manage his own

9   affairs."  27 C.F.R. § 478.11.  "[C]ommitted to a mental institution" means a "formal commitment

10  of a person to a mental institution by a court, board, commission, or other lawful authority.  The

11  term includes a commitment to a mental institution involuntarily."  *Ibid*.  It "does <u>not</u> include a

12  person in a mental institution for observation or a voluntary admission to a mental institution.  *Id*.

13  (emphasis added).

14      The language of Section 922(g)(4) does not include the term "mentally ill."  *Tyler v.*

15  *Hillsdale County Sheriff's Department,* (6th Cir. 2016) 837 F.3d 678, 687.  Instead, the statute

16  relies on "prior <u>judicial adjudications</u> - incompetency and involuntary commitment - as proxies for

17  mental illness."  *Ibid*. citing *United States v. Rehlander*, (1st Cir. 2012) 666 F.3d 45, 50

18  ("[S]ection 922(g)(4) does not bar firearms possession for those who are or were mentally ill and

19  dangerous, but (pertinently) only for any person 'who has been adjudicated as a mental defective'

20  or 'has been committed to a mental institution'").

21      In other words, the determining statutory factor to deny an individual's Second

22  Amendment rights for life is the adjudication not the hospitalization.  <u>There is no evidence of any</u>

23  <u>court ruling that found Clifton to be a danger or to be mentally ill</u>.  The undisputed evidence

24  establishes that Clifton and his legal guardian voluntarily agreed to his mental health treatment

25  and voluntarily agreed to the length of his stay at Gateways Hospital for Clifton's own benefit.  A

26  judge was never involved in Clifton's hospitalization.  Thus, as Clifton was never "adjudicated as

27  a mental defective" or "committed to a mental institution," he is not subject to the Section

28  922(g)(4) firearms prohibition and this Court must restore his Second Amendment rights.

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                              15                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

**1.    As This Court Concluded in the FRCP 12(b)(6) Order, Judicial Involvement is Necessary for the Application of Section 922(g)(4)**

In its FRCP 12(b)(6) Order, this Court denied dismissal of Clifton's Second Amendment claim on the grounds that Clifton had "adequately alleged that his 2001 hospitalization does not constitute an involuntary commitment involving robust judicial involvement under § 922(g)(4)." See p. 10 [615 F.Supp.3d 1185, 1195].  The Court relied on the Ninth Circuit's statement in *Mai*, *supra*, "that commitments under state law procedures that 'lack robust judicial involvement' do not qualify as commitments for purposes of § 922(g)(4)."  See p. 11 [615 F.Supp.3d at 1196].  The Court further relied on *Rehlander*, *supra*, where the First Circuit concluded that Section 922(g)(4) could not be interpreted to allow "ex parte procedures" in state law to justify "a permanent deprivation of the right to bear arms."  *Id.*; see also p. 13 [615 F.Supp.3d at 1197], citing *Rehlander*, 666 F.3d at 47-48.

Moreover, this Court recognized that the district court in *Stokes*, *supra*, "concluded that certifications pursuant to California Welfare & Institutions Code § 5250 that do not involve a judicial order or a hearing before a judge cannot constitute commitments that fall under the purview of § 922(g)(4)."  See FRCP 23(b)(6) Order at p. 11 [615 F.Supp.3d at 1196], citing *Stokes*, 551 F.Supp.3d at 1004-1005.  The Court further noted that both Ninth Circuit cases to address commitment procedures in the context of Section 922(g)(4) "involved judicial determinations that the plaintiffs required institutionalization and in both cases the plaintiffs had been represented by counsel at those court proceedings."  *Id.* citing *United States v. Bartley*, (9th Cir. 2021) 9 F.4th 1128, 1132 and *Mai*, *supra*, 952 F.3d at 1110.

This Court also examined relevant cases in the Eleventh Circuit and the Fourth Circuit finding commitments pursuant to Section 922(g)(4) where the plaintiffs were represented by counsel, a judge received evidence and made findings of fact and issued formal orders for commitment.  See p. 12 [615 F.Supp.3d at 1197] citing *United States v. McIlwain*, (11th Cir. 2014) 772 F.3d 688, 689, 697 and *United States v. Midgett*, (4th Cir. 1999) 198 F.3d 143, 146.

Based on these authorities, this Court concluded in its FRCP 12(b)(6) Order that by alleging that there was no judicial involvement in his 2001 hospitalization, Clifton had adequately

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                          16                        Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1  alleged there was no "commitment" pursuant to Section 922(g)(4).  See pp. 12-13 [615 F.Supp.3d

2  at 1197-1198].  Therefore, in order to resolve Clifton's Second Amendment claim in his favor as a

3  matter of law, Clifton must establish that there is no genuine issue as to any material fact of his

4  2001 hospitalization that evidences any judicial involvement.  As set described above and

5  analyzed below, there is none.

6
7  <center>(a)      **California State Law Does Not Require Judicial Involvement for Involuntary Mental Health Commitments**</center>

8          As Court observed, in its FRCP 12(b)(6) Order, there is no mandatory judicial process in

9  the relevant statutory scheme for involuntary mental health hospitalizations.  See pp. 10-11 [615

10  F.Supp.3d at 1195-1196].  The Lanterman Petris Short ("LPS") Act of 1967, Welfare and

11  Institutions Code sections 5000 et seq., provides the California state law procedures for

12  involuntary commitment/detention of an individual for mental health treatment.  Pursuant to

13  Section 5150, a person may be detained when a peace officer or mental health professional

14  designated by the county finds probable cause to believe that, as the result of a mental health

15  disorder, the individual is a danger to others or to self, or is gravely disabled.  Application of the

16  LPS to a minor for the initial 72-hour hold is governed by Part 1.5 of the LPS, termed the

17  "Children's Civil Commitment and Mental Health Treatment Act of 1988" (hereinafter

18  "Children's Act").  See Welf. & Inst. Code, § 5585.20.

19          Section 5585(a) provides that "[w]hen any minor, as a result of mental disorder, is a danger

20  to others, or to himself or herself, or gravely disabled <u>and authorization for voluntary treatment is</u>

21  <u>not available</u>, a [designated authority] may, upon probable cause, take, or cause to be taken, the

22  minor into custody and place him or her in a facility … for 72-hour treatment and evaluation of

23  minors. The facility shall make every effort to notify the minor's parent or legal guardian as soon

24  as possible after the minor is detained."  (Emphasis added.)

25          Notably, although the Children's Act requires a written application stating the

26  circumstances under which the minor's condition was called to official attention and that

27  authorization for voluntary treatment is not available (Welf. & Inst. Code, § 5585.50(b)), the

28  Children's Act does not require any sort of written notice or advisement to the patient/guardian, as

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                    17                        Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1    does a 72-hour involuntary hold for adults.  See e.g., Welf. & Inst. Code, § 5150(i)(1).  Section

2    5150(i)(1) mandates that a 5150 designation must be accompanied by written information that

3    identifies the hospital staff member making the designation, the grounds for the 72-hour hold and

4    the patient's right to a lawyer, a qualified interpreter and a hearing before a judge if the hold lasts

5    longer than 72 hours.

6        Section 5585.10(b) states that a legislative purpose of the Children's Act is to "safeguard

7    the rights to due process for minors and their families through judicial review;" however, there are

8    no express provisions in the Children's Act to challenge, or for judicial review of, a minor's initial

9    72-hour hold.  This would include a challenge to the alleged probable cause for the hold in the first

10   place.

11       Since he was a minor, Clifton himself was legally incapable of agreeing to voluntary

12   treatment.  *Am. Acad. of Pediatrics v. Lungren*, (1997) 16 Cal.4th 307, 315.  The Children's Act

13   assumes minors lack capacity to consent to their mental health treatment since <u>minors may only be</u>

14   <u>taken into custody under Section 5585.50 when authorization for voluntary inpatient treatment is</u>

15   <u>not available</u>.  This would include situations when the parent, guardian or other person authorized

16   to provide consent is not available, or refuses to authorize voluntary treatment, or agrees to

17   authorize voluntary treatment but factors suggest that the minor would not obtain the necessary

18   voluntary treatment.  In other words, the statute places a large amount of discretion with the

19   designated authority to deem when "authorization for voluntary treatment is not available."

20       There is no requirement of a "court, board, commission, or other lawful authority," as

21   provided in 27 C.F.R., § 478.11, determining or confirming a valid basis for the initial 72-hour

22   hold.  Thus, nothing about the LPS statutory scheme for the initial 72-hour hold can legally be

23   deemed a "commitment," as this Court recognized in the FRCP 12(b)(6) Order.  Accord *Stokes*,

24   *supra*, 551 F.Supp.3d at 1000.

25       After the first 72 hours, the general provisions of the LPS apply to minors.  Welf. & Inst.

26   Code, § 5585.20.  A patient who <u>refuses</u> further <u>voluntary</u> hospitalization after 72 hours may be

27   certified for an additional 14-day period of intensive treatment. Welf. & Inst. Code, § 5250

28   (emphasis added).

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                              18                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1    Copies of a written certification notice must be personally delivered to the patient certified

2 or to the patient's attorney or advocate. Welf. & Inst. Code, §§ 5252, 5253.  The certification

3 notice states that the "authorized agency providing services" has evaluated the patient's condition

4 and alleges the patient is a danger to himself or others or gravely disabled.  Welf. & Inst. Code, §

5 5252.  The person delivering the notice of certification to the patient must inform the patient of the

6 right to a certification review hearing and his "rights with respect to the hearing, including the

7 right to the assistance of another person to prepare for the hearing or to answer other questions and

8 concerns regarding his or her involuntary detention or both."  Welf. & Inst. Code, § 5254.  The

9 person delivering the notice of certification to the patient must inform the patient of his right to

10 judicial review by habeas corpus and of his right to counsel, including court-appointed counsel.

11 Welf. & Inst. Code, §§ 5254.1, 5275; see *Thorn v. Superior Court,* (1970) 1 Cal.3d 666.

12    <u>There is no warning or requirement of warning that failure to seek judicial review would</u>

13 <u>result in a lifetime forfeiture of Second Amendment rights.</u>

14    A certification review hearing is conducted by a court-appointed commissioner or a

15 referee, or by a certification review hearing officer and takes place at the psychiatric facility. Welf.

16 & Inst. Code, § 5256.1.  The patient certified is entitled to be represented by an attorney or other

17 advocate, to present evidence, to question witnesses, and to make reasonable requests for the

18 attendance of facility employees with knowledge of the certification.  Welf. & Inst. Code, §

19 5256.4(a).  If the evidence establishes probable cause that the patient certified is, as a result of

20 mental disorder or impairment by chronic alcoholism, a danger to himself or herself or to others,

21 or is gravely disabled, the patient may be detained beyond the initial 72-hour detention period

22 pursuant to Welfare and Institutions Code section 5250 or 5270.15.  Welf. & Inst. Code, § 5256.6.

23    The patient certified must be given oral notification of the decision at the conclusion of the

24 hearing.  His or her attorney or advocate and the director of the facility where the person is being

25 treated must be given written notification of the decision, including the reasons for it and the

26 evidence relied upon; the attorney or advocate must then inform the patient certified of the right to

27 request release and to have a hearing before the superior court as provided in Welfare and

28

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4

19

Case No. 1:21-cv-00089-NODJ-EPG

Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1    Institutions Code sections 5375 et seq.  <u>A copy of the decision must be submitted to the state</u>

2    <u>superior court</u>.  Welf. & Inst. Code, § 5256.7.

3          In sum, there is no <u>requirement</u> in the LPS and/or Children's Act that a court, board,

4    commission or other lawful authority be involved in the initial 72-hour involuntary hold or the

5    certification for intensive treatment.  Judicial involvement only occurs when a patient requests it.

6    A patient request for judicial involvement can only occur when the patient or his guardian has

7    notice of the right to make such request, which necessarily includes and results from the

8    patient/guardian's understanding that the hospitalization is involuntary.

9          In *Mai*, *supra*, the plaintiff was hospitalized for more than two months <u>after</u> a Washington

10   state court determined that he might be a harm to others.  974 F.3d at 1085 (emphasis added).

11   Here, the LPS and Children's Act reverse the process – the patient is hospitalized involuntarily

12   <u>before</u> proceedings are available to for a judicial determination of whether the evidence establishes

13   probable cause that the patient held and/or certified is, as a result of a mental disorder, a danger to

14   himself or others or is gravely disabled.  This is inconsistent with the legal standard for a

15   commitment under federal law.

16          **(b)     There was No Judicial Involvement Whatsoever in Clifton's 2001**
                   **Hospitalization**

17

18          There is no genuine issue of material fact as to the judicial involvement in Clifton's

19   Hospitalization.  There was no judicial involvement whatsoever.  Nor was there any adversarial

     process by a court, board, commission or other lawful authority.
20

21          The inquiry should end with the undisputed fact that Roque, Clifton's grandmother and

22   legal guardian, was at all times available and gave authorization for voluntary inpatient treatment

23   in 2001.  Roque Dec., ¶¶ 7-11.  Therefore any initial designation or involuntary treatment hold

24   pursuant to Welfare and Institutions Code section 5150/5585.50 is invalid since, under the express

25   terms of the statute, minors may only be taken into custody under Section 5585.50 when

     authorization for voluntary inpatient treatment is not available.
26

27          There is no documentation of who imposed a Section 5150/5585.50 designation or on what

28   basis.  There is no evidence of a written application stating the circumstances under which

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                          20                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1   Clifton's "condition" was called to the attention of an official and that the official had probable

2   cause to believe that Clifton was a danger to himself or others or gravely disabled.  Welf. & Inst.

3   Code § 5585.50(b).  There is no evidence that authorization for voluntary treatment was not

4   available.  There is no evidence of the required documentation for Clifton to be certified for

5   intensive treatment pursuant to Section 5250.

6          There is no evidence that any required documentation was generated or delivered to

7   Clifton and/or his grandmother in 2001.  Neither Clifton nor Roque believe they received any

8   notices or other documents in 2001 or thereafter referencing Welfare and Institutions Code

9   sections 5150, 5585.50 or 5250.  Clifton Dec., ¶¶ 10-11; Roque Dec., ¶ 14.  Gateways Hospital

10  has no records from so long ago.  Cockrell Dec., ¶ 14, Exh. 6.  There was no decision from a

11  certification review hearing pursuant to Section 5256.1 filed with the court as required by Welfare

12  and Institutions Code section 5256.7.  The Los Angeles Superior Court, which would have had

13  jurisdiction over involuntary mental health treatment at Gateways Hospital (in Los Angeles), has

14  no records relating to Clifton's 2001 hospitalization or any mental health treatment.  Cockrell

15  Dec., ¶ 3, Exh. 1.   The East Los Angeles Juvenile Court, which would have had jurisdiction over

16  Clifton as a minor, has no records at all relating to Clifton.  Cockrell Dec., ¶ 5, Exh. 2.   The

17  California Department of Justice has no records indicating judicial involvement in Clifton's 2001

18  hospitalization.  Cockrell Dec., ¶¶ 7, 9-10, Exhs. 3-4.

19         This is all consistent with the recollections of both Clifton and Roche that Clifton's 2001

20  hospitalization was not involuntary.  Voluntary hospitalizations do not qualify as "commitments."

21  27 C.F.R., § 478.11.

22         The record reflects that Clifton's 2001 hospitalization resulted in "a permanent ex parte

23  deprivation of" Clifton's recognized Second Amendment right.  *Rehlander*, *supra*, 666 F.3d at 48-

24  49.  This is improper as a matter of law.  Clifton's Second Amendment rights should be restored.

25  **B.     Section 922(g)(4) is Unconstitutional As Applied to Clifton Because There is No**
            **Historical, Longstanding Prohibition of Second Amendment Rights Arising from**
26          **Receiving Mental Health Treatment as a Child**

27         Clifton's situation is breathtaking.  He lost his Second Amendment rights for the rest of his

28  life when he was 13 years old – not because he committed a crime, not because he threatened to

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                          21                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1   commit a crime, but because he received treatment at a hospital on one occasion.  Luckily, the

2   reported Welfare and Institutions Code section 5250 certification did not result in severe

3   consequences to Clifton's early adulthood.  He had the opportunity to serve in the military and in

4   federal law enforcement, probably by operation of 18 U.S.C., § 925(a)(1), which provides that,

5   except in the case of a misdemeanor conviction for domestic violence (not at issue here), the

6   provisions of the Gun Control Act (which includes 18 U.S.C., § 922(g)(4)) "shall not apply with

7   respect to … receipt, [or] possession … of any firearm or ammunition … issued for the use of …

8   any State or any department, agency, or political subdivision thereof."

9        Section 925(a)(1) may provide a limited exemption to Section 922(g)(4), but it does not

10  provide relief, nor does it eliminate the stigma that comes from being labeled with a lifetime

11  firearms prohibition as a result of mental health treatment.  Clifton need not show harm in order to

12  have standing to bring his constitutional claims;[4] however, there is clear evidence of harm

13  resulting from the decades-old violation of Clifton's constitutional rights in his repeated rejections

14  for sworn law enforcement positions, including by his current agency.  For example, the FSO

15  continues to represent that it will not allow Clifton to attend the Basic Academy for sworn peace

16  officers and/or proceed with the hiring process to become a Deputy Sheriff until Clifton is no

17  longer reported to have a firearms prohibition, despite his excellent history and reputation with the

18  agency as a Correctional Officer.  Zanoni Dec., ¶ 8.

19       Arguably, Clifton did not have gun rights to lose when he was 13 years old.  Federal law

20  prohibits juveniles from knowingly possessing a handgun or ammunition that is suitable for use

21  only in a handgun (with limited exceptions).  18 U.S.C., § 922(x)(2).  Under California state law,

22  all minors are prohibited from possessing any firearm save for being "accompanied by a

23  'responsible adult' and either actively engaging in, or being 'in direct transit to or from,' a

---

24  [4] "A plaintiff does not first need to "expose himself to actual arrest or prosecution to be entitled to

25  challenge a statute that he claims deters the exercise of his constitution rights." *Susan B. Anthony
     List v. Driehaus*, (2014) 573 U.S. 149, 158 quoting *Steffel v. Thompson*, (1974) 415 U.S. 452, 459.

26  In this case, as shown by Clifton's unsuccessful applications to sworn peace officer positions,
     there has been "past enforcement against the same conduct" which is "good evidence that the

27  threat of enforcement is not 'chimerical.' " *Id*. at 164.

28

1   sporting, recreational, agricultural, or business activity that 'involves the use of a firearm.'" *Id*.

2   quoting Pen. Code, § 29615(a)–(c).  "California law does not contemplate a minor relying on a

3   firearm for self-defense." *In re D.L.*, (2023) 93 Cal.App.5th 144, 154.  Nevertheless, at least one

4   federal court has expressly found that Section 922(g)(4) applies to juvenile commitments[5] and the

5   Ninth Circuit impliedly did – or at least assumed as much – in upholding the constitutionality of

6   Section 922(g)(4) as applied to the mental health commitment of a 17-year old in *Mai*, *supra*.  974

7   F.3d at 1085.

8       Based on the precedent set forth in the United States Supreme Court's decision in *New*

9   *York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. ---,  142 S. Ct. 2111 (2022), Section

10  922(g)(4) is unconstitutional as applied to Clifton because there is no longstanding prohibition of

11  Second Amendment rights for children who receive mental health treatment.

12      The Ninth Circuit's analysis of as-applied constitutional challenges, pre-*NYS Rifle & Pistol*

13  *Ass'n*, relied on a two-step inquiry that was fairly perfunctory when it came to evaluating the

14  validity of Section 922(g)(4).  The first step asked whether the challenged law burdens conduct

15  protected by the Second Amendment.  *Mai*, *supra*, 952 F.3d at 1113.  If answered in the

16  affirmative, the second step applied intermediate scrutiny to the challenged law.  *Id*. at 1115.  This

17  allowed the Ninth Circuit to easily and repeatedly conclude that, with a prior commitment to a

18  mental institution and no matter the facts or occurrences since that time, a prohibition on the right

19  to possess a firearms is presumptively lawful and not an unconstitutional burden.

20      However, in *New York State Rifle & Pistol Ass'n, Inc.*, *supra*, the Supreme Court

21  concluded that the two-step approach is "one step too many."  142 S. Ct. at 2117.  Now, firearms

22  regulations may stand only when the government "affirmatively prove[s] that [they are] part of the

23  historical tradition that delimits the outer bounds of the right to keep and bear arms."  142 S. Ct. at

24  2127.

25  _____

26  [5] *Keyes v. Lynch*, (M.D. Penn. 2016) 195 F.Supp.3d 702, 713-715 – the relevant plaintiff was 15
    years old at the time of his mental health treatment and the facts recited in the opinion suggest that
27  his three-day hospitalization did not qualify as a "commitment" under Section 922(g)(4), but this
    was not argued.  See *id*. at p. 707.

28

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                    23                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1    Clifton does not challenge, by way of this litigation, Section 922(g)(4)'s prohibition of the

2    possession of firearms by the mentally ill generally.  As this Court noted in its FRCP 12(b)(6)

3    Order, such prohibition may be presumptively constitutional, even in the wake of *NYS Rifle &*

4    *Pistol Ass'n*.  However, there is no historical application of lifetime legal consequences to

5    children, particularly children under the age of 16, particularly as to firearms rights, particularly as

6    the result of mental health treatment.

7    The *NYS Rifle & Pistol Ass'n* analytical framework requires first a determination if the

8    relevant conduct falls within the plain text of the Second Amendment.  This is easily met because

9    the "conduct" at issue is simply the existence of Clifton's Second Amendment rights.  Clifton

10   seeks the right to bear arms, that is, the lawful ability "to possess and carry weapons in case of

11   confrontation." *District of Columbia v. Heller, (2008)* 554 U.S. 570 at 592.  Per *Heller*, *supra*,

12   this is the core guarantee of the Second Amendment.  *Ibid*.

13   The next step is to determine if Section 922(g)(4) as applied to Clifton is "consistent with

14   this Nation's historical tradition." *New York State Rifle & Pistol Ass'n, Inc.*, *supra*, 142 S. Ct. at

15   2135.  The burden is on the Government to "affirmatively prove that its firearms regulation is part

16   of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at

17   2127.  The Government cannot meet its burden.

18   The Court must most heavily credit the historical sources from around the time of the

19   ratification of the Second Amendment (1791).  *Id*. at 2135-36; see also *id*. at 2163 (Barret, J.

20   concurring) ("today's decision should not be understood to endorse freewheeling reliance on

21   historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of

22   Rights").  There are no sources from that time regulating children's mental health generally or

23   specifically vis-à-vis firearms rights.

24   Children's mental health treatment originated to address juvenile delinquency.  "Not a

25   single article that made reference to children was published in the first 45 years of the *American*

26   *Journal of Insanity* (1844–1889), the forerunner of the *American Journal of Psychiatry* (Levy,

27   1968a). Benjamin Rush (1812)—probably the first American psychiatrist—made no mention of

28   children in his influential textbook *Medical Inquiries and Observations upon the Diseases of the*

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                          24                  Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1   *Mind*."[6]  Children's emotional and behavioral problems "were largely considered moral problems,

2   thus deserving punishment (the result of *badness* rather than *madness*). "  *Ibid*. (emphasis in the

3   original).  The nation's first juvenile court was created in Chicago in 1899.[7]  Dr. John E.

4   Schowalter, M.D. described, in an article in the *Psychiatric Times* published in 2003, child

5   psychiatry's roots as "implanted in the community, rather than in medical schools, and colleagues

6   were more likely to be teachers, judges, social workers and social scientists, rather than

7   physicians." *Ibid*.

8        Thus, it is highly unlikely that there is any historical data, much less laws, regulations or

9   rules, imposing lifetime prohibition on firearms rights – and especially on children – during the

10  colonial era.  Firearms regulation before the Revolutionary War was primarily focused on

11  <u>encouraging</u> gun ownership for defense against external threats (Indians, pirates, non-British

12  European powers) and internal threats (slave rebellions).  For example, as far back as 1645, a

13  Massachusetts Bay Colony order[8] "directed that 'all youth within this jurisdiction, from ten yeares

14  ould to the age of sixteen yeares, shalbe instructed, by some one of the officers of the band, or

15  some other experienced souldier... upon the usuall training dayes, in the exercise of armes, as

16  small guns, halfe pikes, bowes & arrows.....'  The duty to be armed meant that even children were

17  required to learn to use a gun."

18        In a recent case interpreting *NYS Rifle & Pistol Ass'n* with respect to the required age for

19  purchasing handguns, the court in the Eastern District of Virginia noted that "the age of militia

---

[6] Rey, et al.,  "History of Child Psychiatry" (2018) *International Association for Child and Adolescent Psychiatry and Allied Professions* at p. 10 (located at <https://iacapap.org/_Resources/Persistent/49c28ec074bbecfc0ea48df2deea1c6fc1de0a60/J.10-History-Child-Psychiatry-update-2018.pdf> [as of Nov. 30, 2023]); see Cockrell Dec., ¶ 16, Exh. 8.

[7] Schowalter, "A History of Child and Adolescent Psychiatry in the United States" (2003) *Psychiatric Times* (located at <https://www.psychiatrictimes.com/view/history-child-and-adolescent-psychiatry-united-states> [as of Nov. 30, 2023]); see Cockrell Dec., ¶ 17, Exh. 9.

[8] Cramer, Clayton E., "Colonial Firearms Regulation" (April 6, 2016) at p. 4 (located at <https://ssrn.com/abstract=2759961> or <http://dx.doi.org/10.2139/ssrn.2759961> [as of Nov. 30, 2023]); see Cockrell Dec., ¶ 18, Exh. 10.

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                                    25                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1    service dipped down to 16 in many states." *Fraser v. Bureau of Alcohol, Tobacco, Firearms &*

2    *Explosives*, (E.D. Va. 2023) No. 3:22-CV-410, 2023 WL 3355339, at *16, citing *United States v.*

3    *Blakeney*, (Va. 1847) 3 Gratt. 405, 441 (opinion of Brooke, J.) ("During the war of the revolution,

4    sixteen was the military age").  The court further noted that this age likely arose from necessity,

5    with a need for manpower during the Revolutionary War and the military age later rose to 18 in

6    the infancy of the United States.  *Id*. at *17, fn. 24.

7         In dissenting from the denial of rehearing en banc in *Mai*, *supra*, Ninth Circuit Judges

8    Bumatay and Vandyke noted that "[w]hen the Second Amendment was ratified, times were

9    different.  Firearms were ubiquitous and their regulation was sparse.  Firearms were considered

10   essential for defense of the home and hearth."  *Mai v. United States*, (9th Cir. 2020) 974 F.3d 1082

11   ("Mai II"), 1084 citing *Heller*, *supra*, 554 U.S. at 635.  The dissenting judges further pointed to a

12   lack of eighteenth-century laws specifically excluding the mentally ill from gun ownership in

13   concluding that the historical record shows that "mental illness was considered a temporary

14   ailment that only justified a temporary deprivation of rights."  *Id* at 1088, 1090.  For example,

15   New Jersey in 1794 had an "Act for Supporting Idiots and Lunatics, and Preserving Their

16   Estates."  As recounted in the *Minnesota Law Review* in 2023, the language used there was nearly

17   identical to the English law stating the "chancellor ... shall have the care, and provide for the safe

18   keeping of all lunatics, and of their lands and tenements, goods and chattels ... [and] shall be

19   restored to such lunatic, if he or she comes to his or her right mind ...."[9]  Dr. Benjamin Rush,

20   referenced above and a signer of the Declaration of Independence, "believed that mental illness

21   was caused by issues in the circulatory system and was a strong proponent of the belief that mental

22   illness could be cured."[10]

23

24   _____

25   [9] Zachary M. Robole, "In Defense of (Mental) Hearth and Home: Challenges to S 922(g)(4) in the
     Wake of New York State Rifle & Pistol Ass'n v. Bruen," 107 Minn. L. Rev. 2329, 2361 (2023)

26   (emphasis in the original); see Cockrell Dec., ¶ 19, Exh. 11.

27   [10] *Id*. at 2362 citing BENJAMIN RUSH, MEDICAL INQUIRIES AND OBSERVATIONS ON
     THE DISEASES OF THE MIND 24 (1789) ("I infer madness to be primarily seated in the blood-

28   vessels, from the remedies which most speedily and certainly cure it, being exactly the same as

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                          26                Case No. 1:21-cv-00089-NODJ-EPG
              Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1   Add the fact that the law historically has treated children differently from adults.  For

2   example, even under the worst of circumstances, where a minor has been found to have committed

3   capital crimes, the Supreme Court has found that the Constitution (specifically the Eighth and

4   Fourteenth Amendments) prohibits the death penalty.  *Roper v. Simmons*, (2005) 543 U.S. 551.

5   In 1966, the United States Supreme Court expressed dissatisfaction with the state juvenile

6   court systems for their disregard of constitutional rights in adjudicating juvenile crimes.  In *Kent v.*

7   *United States*, (1966) 383 U.S. 541 554-555, the Court stated:

8   "The theory of the District's Juvenile Court Act, like that of other
jurisdictions, is rooted in social welfare philosophy rather than in the

9   corpus juris. Its proceedings are designated as civil rather than
criminal. The Juvenile Court is theoretically engaged in determining

10   the needs of the child and of society rather than adjudicating
criminal conduct. The objectives are to provide measures of

11   guidance and rehabilitation for the child and protection for society,
not to fix criminal responsibility, guilt and punishment. The State is

12   *parens patriae* rather than prosecuting attorney and judge. But the
admonition to function in a 'parental' relationship is not an

13   invitation to procedural arbitrariness.

14   'Because the State is supposed to proceed in respect of the child as
*parens patriae* and not as adversary, courts have relied on the

15   premise that the proceedings are 'civil' in nature and not criminal,
and have asserted that the child cannot complain of the deprivation

16   of important rights available in criminal cases. It has been asserted
that he can claim only the fundamental due process right to fair

17   treatment. For example, it has been held that he is not entitled to
bail; to indictment by grand jury; to a speedy and public trial; to trial

18   by jury; to immunity against self-incrimination; to confrontation of
his accusers; and in some jurisdictions [but not in the District of

19   Columbia, (citations)] that he is not entitled to counsel.

20   'While there can be no doubt of the original laudable purpose of
juvenile courts, studies and critiques in recent years raise serious

21   questions as to whether actual performance measures well enough
against theoretical purpose to make tolerable the immunity of the

22   process from the reach of constitutional guaranties applicable to
adults. There is much evidence that some juvenile courts, including

23   that of the District of Columbia, lack the personnel facilities and
techniques to perform adequately as representatives of the State in a

24   *parens patriae* capacity at least with respect to children charged
with law violation. There is evidence, in fact, that there may be

25   grounds for concern that the child receives the worst of both worlds:

26   _____

27   those which cure fever or disease in the blood-vessels from other causes, and in other parts of the
body").

28

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4
27
Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1    that he gets neither the protections accorded to adults nor the
2    solicitous care and regenerative treatment postulated for children."

3    In the ensuing years, the courts have made procedural changes to ensure more

constitutional, especially due process, protections for children but the general *parens patriae*

mentality remains.  In rejecting a life sentence for violating probation for crimes committed as a

juvenile, the Supreme Court in 2010 relied on *Roper*, *supra*, explaining "that because juveniles

have lessened culpability they are less deserving of the most severe punishments."  *Graham v.*

*Fla.*, (2010) 560 U.S. 48, 68 citing *Roper*, *supra*, 543 U.S. at 569.  The Court continued:

> "As compared to adults, juveniles have a ''lack of maturity and an
> underdeveloped sense of responsibility''; they 'are more vulnerable
> or susceptible to negative influences and outside pressures,
> including peer pressure.' and their characters are 'not as well
> formed.' [Citation.] These salient characteristics mean that '[i]t is
> difficult even for expert psychologists to differentiate between the
> juvenile offender whose crime reflects unfortunate yet transient
> immaturity, and the rare juvenile offender whose crime reflects
> irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders
> cannot with reliability be classified among the worst offenders.'
> [Citation.]  A juvenile is not absolved of responsibility for his
> actions, but his transgression 'is not as morally reprehensible as that
> of an adult.' [Citation.]

> No recent data provide reason to reconsider the Court's observations
> in *Roper* about the nature of juveniles. As petitioner's amici point
> out, developments in psychology and brain science continue to show
> fundamental differences between juvenile and adult minds. For
> example, parts of the brain involved in behavior control continue to
> mature through late adolescence. See Brief for American Medical
> Association et al. 16–24; Brief for American Psychological
> Association et al. 22–27. Juveniles are more capable of change than
> are adults, and their actions are less likely to be evidence of
> 'irretrievably depraved character' than are the actions of adults.
> *Roper*, 543 U.S., at 570. It remains true that '[f]rom a moral
> standpoint it would be misguided to equate the failings of a minor
> with those of an adult, for a greater possibility exists that a minor's
> character deficiencies will be reformed.'"  560 U.S. at 68-69.

Juvenile mental health assessments and/or treatment should be no different.  In fact, the

*parens patriae* should be even stronger, with more of an eye toward "rehabilitation" and recovery

from mental health challenges for juveniles than with criminal conduct, given the vast scope of

situations deemed mental health issues.  "Psychiatry is not ... an exact science, and psychiatrists

disagree widely and frequently on what constitutes mental illness."  *Ake v. Oklahoma*, (1985) 470

U.S. 68, 81.  To the extent that Clifton was having a mental health episode 2001 (rather than a

MESSING ADAM &
JASMINE LLP
ATTORNEYS AT LAW

00134166-4                         28                    Case No. 1:21-cv-00089-NODJ-EPG
Memorandum of Points and Authorities in Support of Motion for Summary Judgment

1   reasonable reaction by any child suffering from physical and emotional abuse in his home

2   environment), there is no factual basis to conclude that he would not fully recover.  There are no

3   grounds to punish him with lifelong deprivation of his Second Amendment rights.

4        In sum, though it is impractical if not impossible to provide a full historical analysis here,[11]

5   it appears that our Nation's history and tradition does not contain "analogous" lifetime restrictions

6   on firearms possession resulting from medical (psychological) treatment for children.  Section

7   922(g)(4) is unconstitutional as applied to Clifton.

8                                        **V.**

9                                   **CONCLUSION**

10       For each of the foregoing reasons, Clifton respectfully requests that the Court grant his

11  motion for summary judgment in its entirety, order that his 2001 treatment at Gateways Hospital

12  and Mental Health Center in Los Angeles was not a commitment to a mental institution within the

13  meaning of 18 U.S.C., § 922(g)(4) and that Section 922(g)(4) is unconstitutional as applied to him.

14  Clifton further requests an order that any lifetime firearms prohibition arising from his 2001

15  hospitalization violates his Second Amendment rights.  In the alternative, Clifton respectfully

16  requests that the Court grant summary adjudication as to either of the above claims and order that

17  his Second Amendment rights be restored.

18  DATED:  December 1, 2023                    MESSING ADAM & JASMINE LLP

19

20                                         By: _____

21                                              Lina Balciunas Cockrell
                                                Attorneys for Plaintiff Dominique Clifton
22

23  _____

24  [11] Multiple courts have noted the difficulties presented by the *NYS Rifle & Pistol Ass'n* framework
    in assembling an historical record and making nuanced historical analyses.  See *Fraser*, *supra*,
    2023 WL 3355339, at *14, fn. 20 citing *United States v. Jackson*, (D. Md. March 13, 2023) No.:
25  ELH-22-141, 2023 WL 2499856, at *10; *Nat'l Rifle Assoc. v. ATF*, (5th Cir. 2012) 700 F.3d 185,
    204 ("we face institutional challenge in conducting a definitive review of the relevant historical
26  record"); *Worth v. Harrington*, (D. Minn. March 31, 2023) --- F.Supp.3d ——, ——, No. 21-cv-
    1348, 2023 WL 2745673, at *9; *New York State Rifle & Pistol Ass'n, Inc.*, *supra*, 142 S.Ct. at
27  2177 (Breyer, J. dissenting).

28